UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X

ORLANDO GODOY, NEREYDA PENA, AUGUSTINA
PICHARDO, VERONICA AZZALINI, BEHZAD PASDAR,
JAIME ALVAREZ, JAIR SALINAS, and SEETA ROJHA,

                      Plaintiffs,                      07 Civ. 7287 (DAB)(MHD)

        - against -

RESTAURANT OPPORTUNITY CENTER OF NEW
YORK, INC.; 417 RESTAURANT LLC a/k/a ROC NY
RESTAURANT LLC d/b/a COLORS; ROC-NY WORKER
OWNER RESTAURANT, LLC a/k/a RWOR; SARU
JAYARAMAN; and GRACE GILBERT (or her
successor), as President of ROC-NY,

                      Defendants.

------------------------------------------------------------------------ X

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO
## THE MOTION TO DISMISS

### INTRODUCTION

        Defendants have responded to the First Amended Complaint with a motion to dismiss

premised largely on factual assertions not found on the face of the complaint and improperly

introduced at this stage of litigation through an attorney's declaration.  Their version of the facts

unfolds around an assertion, not found in the complaint, that the parties' entire relationship was

governed by the contract which counsel annexes as Exhibit C to his declaration.  It also rests on

characterizations of the defendant employer Restaurant Opportunity Center of New York ("ROC-

NY") which rely on assertions made only in the brief, rather than in the complaint, and from a mischaracterization of plaintiffs' claims under the New York Labor Law.

We discuss below why the Court should deny the motion to dismiss and allow this litigation to proceed.

## STATEMENT OF FACTS

As required on an FRCP12(b)(6) motion, the allegations of the complaint must be assumed to be true. Those allegations were as follows:

### PARTIES

3.      Plaintiffs were, at all relevant times, members of ROC-NY, and were, additionally, members of the Workers Cooperative Committee of ROC-NY. Plaintiffs Orlando Godoy ("Godoy"), Veronica Azzalini ("Azzalini"), Augustina Pichardo ("Pichardo"), and Nereyda Pena ("Pena") were, prior to September 11, 2001, employed at Windows on the World, a restaurant located on the 106th and 107th floors of One World Trade Center. Plaintiffs Behzad Pasdar ("Pasdar"), Jaime Alvarez ("Alvarez,"), Jair Salinas ("Salinas"), and Seeta Royha ("Royha") were employed in other restaurants. [All] that joined ROC-NY in around 2002 and 2003. During 2004 and 2005, plaintiffs Pena and Pichardo were members of the Board of Directors of ROC-NY. Plaintiffs were, at all relevant times, "employees" of ROC-NY as that term is defined at 29 USC § 203(e) and Section 190(2) of the New York State Labor Law.

2

4.      Defendant ROC-NY is a not-for-profit corporation organized under the laws of the State of New York. Its principal office is located at 275 Seventh Avenue, New York, New York 10001. It is an employer as that term is defined at 29 USC § 203(s)(1).

5.      Defendant 417 Restaurant LLC ("417 Restaurant LLC") is a corporation which is owned in large part by ROC-NY and which operates a restaurant doing business as "Colors," located at 417 Lafayette Street in Manhattan, New York. Its administrative office is located at 275 Seventh Avenue, New York, New York 10001.

6.      Defendant ROC-NY Worker Owner Restaurant, LLC, also known as RWOR ("RWOR"), is, upon information and belief, a wholly owned subsidiary of ROC-NY which grew out of and/or was created by the Workers Cooperative Committee of ROC-NY. Ostensibly, RWOR was or is to be the vehicle through which employees of 417 Restaurant LLC were to exercise their ownership interest in 417 Restaurant LLC. RWOR's administrative office is located at 275 Seventh Avenue, New York, New York 10001.

7.      Defendant Saru Jayaraman ("Jayaraman") is, and at all relevant times, was, the Executive Director of ROC-NY, and is a director of 417 Restaurant, LLC.

8.      Defendant Grace Gilbert ("Gilbert") is and at all relevant times was the President of ROC-NY. Gilbert is sued in her official capacity. If she no longer holds this position, this suit is brought against her successor.

3

## STATEMENT OF RELEVANT FACTS

9.    As a result of the terrorist attacks of September 11, 2001, 73 employees of the restaurant Windows on the World, which was located at One World Trade Center, were killed.  Another 265 employees of Windows on the World, which included 215 members of Local 100, Hotel and Restaurant Employees Union (hereinafter "HERE"), lost their jobs.

10.    HERE established a relief fund (the "HERE Fund") for the survivor families and displaced workers which collected over $3 million in charitable contributions.

11.    ROC-NY was created in April 2002 and initially helped devise a needs-based assistance plan for the HERE Fund.  Applications for assistance were, in fact, filed with ROC-NY.  ROC-NY also provided training, financed by HERE, to enhance the skills of the displaced workers.  In around August 2003, the HERE Fund granted $112,627 to ROC-NY to support the former Windows on the World workers in an announced endeavor to create a cooperatively owned restaurant.

12.    Plaintiffs Godoy, Pena, and Pichardo became involved with ROC in 2002.  In order to join, they were told they had to attend eight consecutive meetings.  At the meetings members were given job information and training information.  Godoy, Pena, and Pichardo became members in August 2002.  Several months later, ROC-NY began seeking grants to launch what was described as a cooperatively owned restaurant which would be run by displaced

4

workers. A Cooperative Committee of ROC was created to, ostensibly, direct this effort. Godoy, Pena, and Pichardo were initial members of this committee, and the other plaintiffs joined that committee when they joined ROC-NY. The Cooperative Committee had its own Board of Directors which, at various times, included many of the plaintiffs in this action.

13.    Plaintiffs Pasdar, Alvarez, and Azzalini joined ROC-NY and its Cooperative Committee in around 2003. Plaintiff Salinas joined in around 2004.

14.    In creating ROC-NY's Cooperative Committee, defendant Jayaraman told plaintiffs, and the members of ROC-NY, that Cooperative Committee members would become owners of the new restaurant in return for doing a certain amount of work, which she described as "sweat equity," for the Committee. That number was set at 100 hours; over the next two years, the hours required were increased as plaintiffs and other Cooperative Committee members were asked to meet new 100 hour work requirements. Plaintiffs performed this work with the understanding that it would gain them equity in this new restaurant and result in ongoing employment once the restaurant was in operation.

15.    In October 2002, ROC-NY began to negotiate with the Cooperativa Italiana di Ristorazione ("CIR"), an Italian cooperatively owned restaurant group, over a proposal to have CIR invest $1 million in the ROC-NY cooperative restaurant. ROC-NY did fund raising to send a delegation of twelve (12) ROC-NY members, including plaintiffs Godoy and Pena, to Italy to meet with CIR. ROC-NY's effort to create a cooperatively owned restaurant was

written up in *The New York Times*, *People Magazine*, and numerous other publications. Eventually, CIR agreed to invest $1 million.

16. Members of the Cooperative Committee, whom ROC-NY began to describe as "worker-owners," and who ROC-NY described in its August 2004 liquor license application as "co-owners," worked at various fund-raising events, doing catering, cooking, serving, set-up, clean-up, shopping, and driving. All money raised at these events, including money paid to ROC-NY as tips, went to ROC-NY. The plaintiffs went to conferences, met with consultants, organized, led, and participated in picket lines in front of restaurants allegedly violating state and federal labor laws, met with politicians, and attended press conferences designed to publicize ROC's efforts and plans. Plaintiffs and other members of the Cooperative Committee were also required to go to weekly meetings, which lasted three to five hours; at those meetings participants developed plans for the restaurant, for fund-raising, for publicity, and so forth. These efforts and meetings continued throughout 2003 and 2004. Plaintiffs engaged in these activities without pay based upon the continuing representations by ROC-NY that their labor guaranteed them equity in the "worker-owned restaurant" they were working to create, and would result in ongoing paid employment in this new restaurant.

17. In a December 4, 2004 letter to the CIR, ROC-NY advised CIR that members of the cooperative would earn equity in the RWOR "through sweat equity participation requirements." That letter further stated that the "capital [of RWOR] will be sweat equity converted to cash equivalent in stock."

6

18.     In late September 2004, plaintiffs and all members of the ROC-NY
Cooperative Committee were advised that there would be a mandatory meeting on
October 4, 2004, and that failure to attend would result in being eliminated from
the list of cooperative owners, despite the fact that no such requirement existed in
the ROC-NY Bylaws.

19.     At the October 4, 2004 meeting, Cooperative Committee members
were told that they had to sign a contract, at that meeting, or lose their
membership in ROC-NY and its Cooperative Committee. The contract required
that each member "contribute" an additional three hours of work per week and
pledge that until the restaurant opened, they would continue to perform the sort of
unpaid labor for ROC-NY which they had performed for several years. The
contract was distributed only in English, even though many of the Committee
members did not read English well. Discussion amongst Committee members
was prohibited, and efforts to postpone the signing requirement to another day
were rebuffed.

20.     Plaintiff Godoy refused to sign the document and was told on
December 13, 2004, without basis in the ROC-NY Bylaws, that he would lose his
Cooperative membership if he did not sign the contract by December 20, 2004.
Godoy refused and, after explaining his position to the Board of the Cooperative
Committee, on January 3, 2005 he was expelled from the Cooperative Committee,
and ROC-NY, without further process. Godoy was not permitted thereafter to
attend Cooperative Committee or ROC-NY meetings.

21.     On or about January 18, 2005, ROC-NY released a proposed

business plan for the restaurant, which was to be called "Colors." In that business

plan, in describing the "Equity Investors," ROC-NY, in mentioning the staff,

stated: "Not only are they workers, but owners, with a vested interest in providing

first class hospitality and food."

22.     On January 25, 2005, ROC-NY convened a "Restaurant Industry

Summit," the speakers at which included three members of the Cooperative

Committee:  plaintiff Behzad Pasdar, Rafael Duran, and Utzok Zaidan.  The three

were described as "restaurant workers [who] will be co-owners of Colors, the

ROC-NY cooperatively owned restaurant."

23.     On February 5, 2005, ROC-NY held a "Staff and Board Retreat" at

which the staff discussed, among other things, the lack of Cooperative Committee

member participation.  In fact, only about 22 of around 35 Committee members

had been regularly attending meetings.  The active members included the

plaintiffs.  However, the members who ceased participation did not lose

membership in either the Cooperative Committee or ROC.

24.     In about March 2005 it began to become apparent to plaintiffs and

other members of the Cooperative Committee that, in fact, ROC-NY's plan for

"cooperative" worker ownership was not what ROC-NY and Jayaraman  had

represented it to be.  ROC-NY had decided to constitute itself as the sole member

of the worker's ownership corporation.  At the outset, the restaurant stock was to

be owned 50 percent by ROC-NY and 50 percent by CIR, with a transfer of 20

8

percent to the Cooperative Corporation or RWOR at some future indeterminate date. At all prior times plaintiffs had been led by ROC-NY and Jayaraman to believe that the restaurant being created was to be wholly owned by its employees, which was their understanding of the word "cooperative."

25.    Pasdar and Pena, as members of the Cooperative Committee Board, began to openly question whether what was being created was a worker-owned entity, and whether they had been misled. Try as they might, these Board members found that it was impossible to challenge the plan adopted by ROC-NY. Four of the six Cooperative Committee Board members drew up a list of demands, which were quickly signed by 15 of the 22 active Cooperative Committee members.

26.    The dissenting Cooperative Committee members brought their demands to a Cooperative Committee membership meeting in March 2005. The handed their demands to defendant Jayaraman and subsequently retained counsel, who attempted to speak with ROC-NY to negotiate over the terms of worker-ownership. On or about April 25, 2005, ROC-NY brought a mediator – whom it had chosen without input by the dissidents – to meet with the dissident members and with ROC-NY. When the dissidents asked to bring an attorney into the meeting, the mediator cancelled the meeting. The mediator, however, convened a meeting with several of the Cooperative Committee members not allied with Pasdar and Pena. The dissenters attempted to enter the meeting, led by plaintiff

9

Pasdar. When they entered the room over the mediator's protest and efforts to push the door closed, the mediator adjourned the meeting.

27.    On May 7, 2005, plaintiff Pasdar received a letter from defendant Gilbert, as President of ROC, advising him that on May 11, 2005 the ROC-NY Board would be voting about whether to terminate his membership in ROC-NY based on "allegations of aggressive and violent behavior towards members, staff, and consultants of ROC-NY." The only right Pasdar was given at the meeting was an opportunity to speak prior to the Board's vote. He was given no particulars about the exact actions he had taken to warrant discipline.

28.    On May 10, 2005, counsel for Pasdar requested of ROC that Pasdar have a fair hearing, including specification of charges, the right to confront witnesses, and the right to counsel. Counsel did not receive a response.

29.    On May 11, 2005, several persons at the ROC Board meeting made statements critical of Pasdar, describing him as "belligerent" and stating that Pasdar "represented a real threat to the success of this venture" and that he put the CIR investment at "serious risk." Pasdar was not allowed to be present for all of the statements against him. Subsequently, the Board voted to expel Pasdar from ROC-NY, and, consequently, from its Cooperative Committee. At that same meeting, the ROC-NY Board adopted a series of resolutions affirming the structure of the "cooperative" restaurant that the dissenters had objected to.

30.    After Pasdar's expulsion, ROC-NY began to hold "mandatory meetings," something not provided for in its Bylaws. Cooperative Committee

members were engaged in one-on-one, intimidating meetings with ROC-NY's

leadership and paid staff. After thirteen Cooperative Committee members,

including plaintiffs, delivered a letter to the ROC-NY Board on May 23, 2005

demanding a "true say in how the cooperative is established, structured and run,"

ROC's efforts escalated. Plaintiffs Pena's and Pichardo's terms on the ROC-NY

Board ended and they were not asked to continue. Closely controlled and

intimidating meetings of the Cooperative Committee were held, at which various

legal documents were "reviewed" and "adopted." Members were called and

visited at home by ROC-NY staffer. In addition, members were told that a new

100 hours of sweat equity would be required and that the first cooperative owners

would not be designated until August 2005.

31.    As a result of these demoralizing and intimidating actions, and a

sense that they had been misled, many Cooperative Committee members other

than Pasdar and Godoy ceased coming to meetings. The remaining plaintiffs and

many other Cooperative Committee members, as a result, had their membership in

the Cooperative Committee terminated without basis in the ROC Bylaws, and

without due process, and were not included in the initial group of "worker-

owners" announced by ROC-NY in around August 2005.

32.    In around December 2005, ROC-NY opened Colors. None of the

plaintiffs, and no more than 10 to 12 of the ROC-NY Cooperative Committee

members who had contributed the required sweat equity, were included as

"owners" and were present as part of the restaurant's opening day workforce.

11

None of the employees working at Colors actually had any equity in the restaurant; at best, they had a promise of some sort of equity in the future.

33.    As a result of defendants' aforedescribed actions, plaintiffs received no compensation for the work they did for ROC-NY, lost their membership in ROC, were given no ownership interest in Colors, or even the RWOR, and suffered severe emotional distress, to their injury.

### CLAIMS ASSERTED

Plaintiffs asserted four causes of action and described them as follows:

#### FIRST CAUSE OF ACTION

35.    By failing to pay plaintiffs for their work, and by collecting their tips, defendants violated §§ 191, 196(d), and 198(b)(2) of the New York State Labor Law.[1]

---

[1] Section 191 of the New York State Labor Law provides:

Frequency of payments.

1.    Every employer shall pay wages in accordance with the following provisions:
   a.    Manual worker.--- (i) A manual worker shall be paid weekly and not later than seven calendar days after the end of the week in which the wages are earned; provided however that a manual worker employed by an employer authorized by the commissioner pursuant to subparagraph (ii) of this paragraph or by a non-profitmaking organization shall be paid in accordance with the agreed terms of employment, but not less frequently than semi-monthly.

Section 196(a) of the New York State Labor Law provides:

Gratuities. No employer or his agent or an officer or agent of any corporation, or any other person shall demand or accept, directly or indirectly, any part of the

### SECOND CAUSE OF ACTION

36.      By intentionally failing to pay plaintiffs even the statutory minimum wage for the work they performed, defendants violated 29 U.S.C. § 206.

### THIRD CAUSE OF ACTION

37.      Defendants' arrangement with plaintiffs to do work in return for "sweat equity" in a newly created restaurant was contractual. The expulsion of plaintiffs from ROC, and the failure to provide them with equity in the restaurant or employment at the restaurant, was a breach of contract.

### FOURTH CAUSE OF ACTION

38.      Defendants induced plaintiffs to provide work for ROC and good will for its efforts to open a restaurant by promising, falsely, that the work would result in an ownership share in the restaurant and future employment. The failure to such an ownership interest or future employment constitutes fraud.

---

gratuities, received by an employee, or retain any part of a gratuity or of any charge purported to be a gratuity for an employ.

Section 198(b)(2) of the New York State Labor Law provides:

Whenever any employee who is engaged to perform labor shall be promised an agreed rate of wages for his or her services, be such promise in writing or oral, or shall be entitled to be paid or provided prevailing wages or supplements pursuant to article eight or nine of this chapter, it shall be unlawful for any person, either for that person or any other person, to request, demand, or receive, either contribution of any part or all of said employee's wages, salary, supplements, or other thing of value, upon the statement, representation, or understanding that failure to comply with such request or demand will prevent such employee from procuring or retaining employment. Further, any person who directly or indirectly aids requests or authorizes any other person to violate any of the provisions of this section shall be guilty of a violation of the provisions of this section.

13

## ARGUMENT

In assessing a motion to dismiss, the Court must take all of plaintiff's factual allegations as true, and can rule in moveant's favor only where no set of facts could support plaintiff's claim. Annis v. Courts of Westchester, 36 F.3d 251, 253 (2d Cir. 1994). If the Court restricts itself to the four corners of the First Amended Complaint, it cannot, under this standard, dismiss any of plaintiffs' claims.

## POINT I

### PLAINTIFFS' CLAIM FOR BREACH OF CONTRACT IS NOT DISMISSABLE AS A MATTER OF LAW.

**A.     The October 2004 Document Cannot, as a Matter of Law, Be Found to Be the Sole Contract between the Parties, Nor Can the Complaint Be Read as Not Alleging Performance by Plaintiffs.**

Defendants, defying the cardinal rule of Rule 12(b)(6) motions, assert that plaintiffs entered into only one alleged "contract" with ROC-NY, attach that contract to their pleadings, and then assert that the complaint does not allege performance on the part of plaintiffs.

The First Amended Complaint alleges that defendants made a number of contractual agreements with the plaintiffs. In ¶ 14 of the First Amended Complaint, plaintiffs allege a 2002 contract, stated by defendant Jayaraman to the effect that "Cooperative Committee members would become owners of the new restaurant in return for doing" 100 hours of work. Paragraph 14 asserts that over the next two years, the "hours required were increased as plaintiffs ... were asked to meet new 100 hour work requirements."

That same paragraph alleges performance: "Plaintiffs performed this work with the understanding that it would gain them equity in [the] new restaurant and result in ongoing

14

employment once the restaurant was in operation. Similarly, in ¶ 16, plaintiffs' work is described. They "worked at various fund-raising events, doing catering, cooking, serving, set-up, clean-up, shopping, and driving." They "went to conferences, met with consultants, organized, led, and participated in picket lines, met with politicians, attended press conferences," and attended weekly meetings of three to five hours in length.

Paragraph 16 then describes the repeated statement of the oral contract which underlies this lawsuit: "Plaintiffs engaged in these activities without pay based upon the continuing representations by ROC-NY that their labor guaranteed them equity inn the 'worker-owned restaurant' they were going to create, and would result in ongoing paid employment in this new restaurant."

Defendants attach a document signed by seven of the eight plaintiffs in October 2004 and assert that this was the contract between the parties, and that it superceded all prior agreements.[2] This is a series of factual assertions which do not draw their essence from the complaint. The complaint makes no such allegation or admission. The document attached to counsel's declaration makes no such assertion. The document, on its face, does not appear to add

_____

[2] Defendants inappropriately annex these documents and describe it as the contract between the parties, and do so in reliance on International Audiotext Network, Inc. v. AT&T, 62 F.3d 69, 72 (2d Cir. 1995), and Cortec Indus., Inc. v. Sum Holding, Inc., 949 F.2d 42, 48 (2d Cir. 1991). In International Audiotext, the Second Circuit permitted reference to a document not annexed to the complaint in the context of a 12(b)(6) complaint "when a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it solely relies and which is integral to the complaint." As we discuss in Point I(A), the documents annexed as Exhibit C to counsel's declaration are neither integral to the complaint or a document upon which plaintiffs "solely" rely. See, to the same effect, Cortec, supra, 949 F.2d 42 at 47 ("when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the defendant may produce [it] when attacking the complaint for its failure to state a claim").

a new or additional 100 hour requirement; it simply states that the 100 hour sweat equity

obligation must be completed by December 20, 2004; the complaint asserts that in plaintiffs'

cases, the 100 yours of work had been completed, many times over, prior to October 2004.

Defendants assert that the October 4, 2004 "contract" requires that plaintiffs were required to

"maintain membership in ROC-NY." No such requirement is found in the document.

With respect to plaintiff Godoy, defendants assert that he was ineligible to

participate in the restaurant because he didn't sign the October 2004 document. Nowhere do the

defendants produce a permissible, or even impermissible (under 12(b)(6)), factual basis for this

assertion. The First Amended Complaint describes an oral agreement between defendants and

Godoy going back to 2002. The complaint asserts that Godoy met his sweat equity requirement

long before October 2004, and makes no reference to any agreement between Godoy and

defendants that at some point in 2004 had to be reduced to a writing.

Given the need to draw all defendants' assertions with respect to Exhibit C,

inferences against the moveants, and the fact that the record does not provide a basis for such

inferences, dismissal of the breach of contract claim on this record would be inappropriate.

The First Amended Complaint provides another reason not to accept the October

2004 document as the embodiment of a binding agreement between the parties. In ¶ 19 of the

First Amended Complaint, plaintiffs allege that they were forced to sign the October 2004

document or lose their membership in ROC-NY, that discussion amongst Committee members

was prohibited and efforts to postpone the signing requirement were rebuffed. Paragraph 19 goes

on to allege that when plaintiff Godoy refused to sign the unilateral document (which states no

consideration on the part of ROC-NY), he was expelled and barred from meetings. The October

2004 document, at this stage of the litigation, on a Rule 12(b)(6) motion, cannot be relied upon as an arms-length agreement between the two parties upon which a dismissal of this breach of contract claim can rely.

   The breach of contact claim cannot be dismissed under Rule 12(b)(6).

  **B.**  <u>**The Breach of Contract Claim Is Not Barred by the Statute of Limitations.**</u>

   Defendants describe plaintiffs' breach of contract claim – seeking an ownership share in and employment at the cooperative restaurant – as a "thinly disguised attempt to recast the claims they previously withdrew in order to circumvent the Article 78 statute of limitations." In fact, it is not. Plaintiffs did withdraw an entirely separate claim seeking reinstatement to ROC-NY (see ¶ 3 of the Prayer for Relief of the initial Complaint). Plaintiffs no longer seek such relief and, in fact, seek no relief based upon the violation of ROC-NY's bylaws. Nowhere does the First Amended Complaint state, and nowhere does the October 204 document defendants improperly rely on state, that either employment at the new restaurant or the holding of an ownership interest in the restaurant requires membership in ROC-NY. Absent proof of such a requirement by defendants at this stage (or any stage) of the litigation, dismissal would be inappropriate.

## POINT II

### PLAINTIFFS' FLSA CLAIM CANNOT BE DIS-MISSED AS A MATTER OF LAW.

Defendants ask this Court to find, as a matter of law, that even if the complaint is read in such a way as to draw all inferences in favor of plaintiffs, defendant ROC-NY is not an "enterprise engaged in commerce," and that plaintiffs were not "employees" of ROC-NY.

The First Amended Complaint describes ROC-NY as follows:

- ¶ 11 — ROC-NY handled applications for assistance from restaurant workers displaced by the 9/11/01 terrorist attacks.

- ¶ 11 — ROC-NY also provided training ... to enhance the skills of displaced workers.

- ¶¶ 11 and 12 — ROC-NY, beginning in 2002, spearheaded an endeavor to create a cooperatively owned restaurant.

- ¶ 15 — ROC-NY negotiated with a restaurant group based in Italy and secured a $1 million investment from that group in the restaurant ROC-NY planned to open.

- ¶ 16 — ROC-NY applied for a liquor license in August 2004.

- ¶ 16 — ROC-NY held fund-raising events where food was served and participants left tips, and that all money raised at these events went to ROC-NY.

- ¶ 16 — ROC-NY set up picket lines in front of restaurants allegedly violating state and federal labor laws.

- ¶ 16 — Plaintiffs cooked, served, set up, cleaned up after, shopped for, and did driving in connection with ROC-NY's fund-raising events.

- ¶ 16 — Plaintiffs organized, led, and participated in picket lines in front of various restaurants.

- ¶ 16 — In connection with the creation of the "workers co-op" restaurant, plaintiffs went to conferences, met with consultants, met with politicians, attended press conferences, attended meetings where restaurant planning occurred, including planning for fund-raising and for publicity.

- ¶ 24 — ROC-NY owns 50 percent of the stock of the for-profit restaurant plaintiffs had worked to create. Since the Italians' stake was worth $1 million, this investment had a value of $1 million.

It is baffling to understand how an entity developing plans to open a restaurant, raising its own capital for that restaurant, and negotiating with an Italian entity to invest $1 million in the restaurant cannot be said to be "engaged in commerce."

In <u>Tony and Susan Alamo Foundation v. Secretary of Labor</u>, 471 U.S. 290 (1985), the Court held, with respect to Fair Labor Standard Act (FLSA) coverage, that "the Act contains no express or implied exception for commercial activities conducted by religious or other non-profit organizations." 471 U.S. at 296. The Court then deferred to the Department of Labor regulation addressed to this issue, found at 29 CFR § 779.214, which states:

> "Activities of eleemosynary, religious or educational organization[s] may be performed for business purposes. Thus, where such organizations engage in ordinary commercial activities, such as a printing and publishing plant, the business activities will

19

be treated under the Act the same as when they are performed by
the ordinary business enterprise."

According to the First Amended Complaint, ROC-NY's principal activity after 2002 was

its effort to open a restaurant. These efforts included raising capital, looking for and negotiating

with investors, publicizing their restaurant, developing plans for their restaurant, etc. All of these

are business activities, even though they were carried out by a non-profit. The fact that this

restaurant was going to have the purportedly lofty purpose of testing out the potential of

cooperative ownership did not take away from the fact that the business was in competition with

ordinary commercial enterprises and would therefore have an effect on commerce. Id at 299.

Accord, Archie v. Grand Central Partnership, Inc., 997 F.Supp. 504, 529 (SDNY 1998).

Compare Wagner v. Salvation Army, 660 F.Supp. 466, 468 (ED Tenn. 1986)(no coverage where

transient lodge did not compete with private entrepreneurs).

29 USC § 207 extends the Act's coverage to employees not themselves engaged in

commerce or the production of goods as long as they are employed in enterprises so engaged.

The 1974 amendments to 29 USC § 203(S)(1)(A)(i) have been interpreted as a further extension

of the Act's coverage to activities of enterprises which merely affect commerce. Joles v. Johnson

Country Youth Service Bureau, Inc., 885 F.Supp. 1169, 1174 (S.D. Indiana 1995); Radulescu v.

Moldowan, 845 F.Supp. 1260 (N.D. Ill. 1994).

Given this law, the facts alleged by plaintiffs, as a matter of law, an assertion that they

were employees of ROC-NY as that term is defined in the FLSA, not the opposite.

In Alamo Foundation, the U.S. Supreme Court described the test of employment under

the FLSA as one of "economic reality." 471 U.S. at 301. It further held that the fact that the

20

compensation was received primarily in the form of benefits rather than cash is immaterial.  In

Grand Central Partnership, the Second Circuit formed two elements critical to the determination

of "economic reality":  the "expectation or contemplation of compensation" and "whether the

employer received an immediate advantage from any work done by the individuals."  997

F.Supp. at 533.  The facts as alleged in the complaint paints a picture of individuals who did

work in contemplation of future remuneration (an ownership share of the restaurant as well as a

job in that restaurant), and an entity which used plaintiffs' work to build both capital and good

will necessary to the opening of the restaurant.  Defendants are just plain wrong when they assert

that the complaint does not plead an expectation of compensation.  At least at the pleading stage,

the Court cannot hold that the expectation of "sweat equity" and permanent employment was not

an expectation of compensation from the very business enterprise alleged to be at the center of

ROC-NY's activities.

The FLSA claims must be allowed to stand.


## POINT III

### PLAINTIFFS' NEW YORK STATE LABOR LAW CLAIMS SHOULD NOT BE DISMISSED.

In asserting their claims under the New York State Labor Law plaintiffs were attempting

to assert a claim for not being paid wages and for having their tips taken from them.  Plaintiffs

should have cited New York Labor Law § 651, the New York State Minimum Wage Act.  Under

that Act, an employee includes any individual employed or permitted to work by an employer in

any occupation with the exception of a few narrow categories.  New York Labor Law § 651(5);

Alamo Foundation, supra, at 536.  An employer includes any individual, partnership, association,

corporation, business trust, legal representative, or any organized group of persons acting as an employer. New York Labor Law § 651(6). Defendant ROC-NY is not covered by any exemption under the Act.[3] Defendants cannot escape a claim for payment of a minimum wage required by § 652(1) and (3) by asserting that payment of a base wage be contingent upon a further event.[4]

Once the minimum wage requirement of § 652 is read into the pleading, the arguments made by defendants about the claims under Labor Law Sections 191 and 198(b)(2) are preposterous. An employee does not need to have a contract in order ot complain about a failure to be paid regularly, and § 198(b)(2), which prohibits an employer from requesting, demanding or receiving a return, donation or contribution of any part of an employee's "wages ... or anything of value" on threat of loss of employment. The cases cited by defendant which are addressed to cases involving unpaid incentive compensation based upon corporate performance, are irrelevant. Plaintiffs' seeking, under the Labor Law, to be paid for the actual work they did, is not analogous

---

[3] § 652. Minimum wage. 1. Statutory. Every employer shall pay to each of its employees for each hour worked a wage of not less than:

$4.25 on and after April 1, 1991
$5.15 on and after March 31, 2000,
$6.00 on and after January 1, 2005,
$6.75 on and after January 1, 2006,
$7.15 on and after January 1, 2007, or, if greater, such other wage as may be established by federal law pursuant to 29 U.S.C. section 206 or its successors or such other wage as may be established in accordance with the provisions of this article.

3. Non-profitmaking institutions. (a) Application of article. This article shall apply to non-profitmaking institutions.

[4] Given the failure to state the correct section of the Labor Law, plaintiffs seek leave to amend the complaint to add § 651 to the legal basis for their Third Cause of Action.

in any way to cases involving bonuses and stock options. To apply the law the way defendants ask would allo9w employers to profit from the labor of at-will employees, promising them "sweat equity" at some later date, and then deny any obligation to those employees for work performed if they were terminated prior to the "sweat equity" becoming available.

With respect to plaintiffs' § 196-d claim, alleging the unlawful taking of tips, ¶ 15, which describes the taking of tips by ROC-NY at fundraising events at which plaintiffs worked, would appear to be sufficient to withstand dismissal under Rule 12(b)(6).

### POINT IV

### PLAINTIFFS PLEAD A CLAIM FOR FRAUD DISTINCT FROM A CLAIM FOR BREACH OF CONTRACT.

Central to defendants' motion to dismiss plaintiffs' fraud claim is its assertion that the only cognizable fraud claim alleged is that defendants never intended to provide plaintiffs with their ownership share in the new restaurant, or with a future job. They are right in asserting that such a claim would be a reassertion of the breach of contract law. However, plaintiffs assert that defendants did make a separate fraudulent misrepresentation, to wit, that they intended to create "worker owned, cooperative" restaurant, when, in fact, they intended to create a restaurant in which some employees, many years down the road, might own 20 percent of the stock of a corporation. See First Amended Complaint, ¶¶ 14, 15, 16, 22, and 24. Plaintiffs seek permission from the Court to amend the statement of their Fourth Cause of Action to reflect this fraudulent assertion.

23

To maintain a claim for fraud, a plaintiff must either (1) demonstrate a legal duty separate from the duty to perform under the contract, or (2) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract. <u>Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.</u>, 98 F.3d 13, 19 (2d Cir. 1996). Under the standard of pleading evaluation required by FRCP 12(b)(6), if plaintiffs are allowed to amend their complaint, it cannot be rightfully argued that plaintiffs have not made out a claim for fraud.

Plaintiffs allege that ROC-NY was set up by their union to aid them after being displaced by the 9/11/01 attacks, an allegation which, for 12(b)(6) purposes, meets the requirement of a legal duty. Plaintiffs relied on the characterizations their union-backed institution to give up time, and in many cases, opportunities to pursue other employment, because they believed that they were working to create a worker-owned co-op. Plaintiffs became the poster children for this fraudulent misrepresentation, had money raised and invested in their interest, and then beneffitted in no way from defendants' activities. They bore a special relationship to the fraud and should be in a position to sue to recover damages arising out of that fraud.

## CONCLUSION

For the aforestated reasons, the motion to dismiss should be denied.


Dated: New York, New York
       January 11, 2008


                                   SCHWARTZ, LICHTEN & BRIGHT, P.C.
                                   Attorneys for Plaintiffs

                          By:_____
                                   Arthur Z. Schwartz
                                   275 Seventh Avenue, 17th Floor
                                   New York, New York  10001
                                   (212) 228-6320

25